18203 Dawes v. U.S. Good morning and may it please the court. My name is Michael Grudberg. I represent petitioner appellant Jonathan Dawes. Mr. Dawes appeals from the denial of his petition for a writ of error quorum nobis to correct a fundamental error in his conviction for conspiracy to commit insider trading. Specifically, he filed his petition after this court in the Newman case recognized an element of tippy liability that had it been an element at the time of his plea. He was charged and he pled guilty to conspiring to commit insider trading, is that correct? That's correct. Does that make a difference here? I submit that it does not, Judge Lohier. Why not? What do you say about that? As the court recognized in Newman itself, if Mr. Dawes at the time of his plea was not able to allocute sufficient to satisfy the requisite state of mind for insider trading, i.e. not able to recite facts as a part of his guilty plea to establish that he had knowledge of a benefit to agent Royer the tipper, the absence of that state of mind for the substantive offense under the Gaviria case makes it impossible for him to have sufficient mens rea. Am I? Go ahead. You go ahead. No, isn't the fact that the tipper told him to short... enough that he thought the tippers had the knowledge, had the... that all the things, you know, our law has been complicated there. We've gone from Newman, this, that, and to Maradona too, but it's hard for me to see whether in the terms of the law as it was then or the law as it is now, there wasn't enough here. I guess I would say that my first answer to that, Judge Calabresi, is that for the immediate analysis, Mr. Dawes did not allocate to that theory that he was, that he received a tip directly from the agent who told him to short the blank out of it and to take a step back to the context that I think was really well plowed both in the plea context and in the sentencing context. I think it's important to remember that Mr. Dawes was and was for every day of his life for a half dozen years before this call with Agent Royer, a short seller specializing in fraudulent issuers. He already had a short position in OSIN, the security at issue. He was only in touch with Agent Royer because he had contacted another short seller and a longtime friend of his to get the name of an SEC lawyer so that he could deliver information to the government. Yeah, and he went to the SEC and then the SEC went to the FBI so that it was not a direct, but in the end, wasn't there a kind of thing that we now say is enough knowledge to be guilty? I would say not, Judge, and I really would focus the context on what was in Mr. Dawes's mind when he essentially received that call. A week had gone by. He had passed his information along to the SEC. He knew that the SEC, I should be careful about that, he knew that he had delivered a tape and incriminating information to the SEC. The SEC, in fact, called him, unrelated to Agent Royer, the day after he spoke with Royer on the phone. And again, he already had a short position. So for him to hear short the blank out of it, I submit is different from the ordinary brother-in-law case where the member of the board of directors says sell and sell now. That's confirmatory. So it may still be insider trading in one sense if it confirms. I mean, he understood from the sentencing memorandum from two exceptional defense counsel, it's clear that he understood that he was getting misappropriated material and from inside information that was not public, even though, as you point out, he had provided some part of that information to the SEC, and he doubles down. He has a short position, but he acts on the advice. I would say this, Judge Loyer, he did not deny in 2005, and we're certainly not here to deny today, that he understood that the information that Agent Royer was allowing to leave the FBI was misappropriated in the sense that Mr. Dawes knew that the rules of Agent Royer's employment did not allow him to share that kind of information. Let me see if I understand. You're saying that even if at the time what he allocated would have been sufficient for the law of the circuit as it was then, but would not be, you're saying, sufficient now, and even though there was something that under the law today he could have allocated to, which would have made him guilty under the law today, because that is not what it was then, that is sufficient for him to get coram nobis. Is that what you're arguing? I'm not saying that, Judge Calabresi. I think that — I thought you answered me and you said, yeah, that's true, but that's not what he allocated to. I guess what I would focus on is the gift requirement, which was true in 1983 with Dirks. This Court in Newman said Dirks has been true all along, and that's part of the percolation, Ms. Chagas, that we're all trapped in. But I would say, Judge, that the critical moment for Mr. Dawes is whether he thought he was receiving a gift from that agent who told him to short. He had been shorting that stock. He shorted every day of his life. The agent knew that, so for him to use that colorful expression is little more than saying — and Mr. Dawes had asked him, what more should I do? And the agent offhand said, short the blank out of it. Would you then address his status as a remote tippee, a downstream tippee? Because it seems to me that there was certainly evidence, and maybe even in part of his allocution, an understanding that the FBI agent was or had a relationship with the trader and intended to benefit the trader, and that that relationship, in one sense, under even Martoma, is enough to satisfy the personal benefit requirement. I think what he said in his allocution was that he assumed that the other shorts, Mr. Cleveland, Mr. El-Ghindi, were using the information that they received from the agent to execute securities transactions. When you are allocuting to a conspiracy to commit insider trading, which is a little unusual, right, because it caps your client at five years, and so he's no longer exposed to the 20-year statutory maximum. When you're exposed to a conspiracy, isn't assuming — isn't the word assuming enough to at least allocute to a conspiracy, as opposed to the substantive offense of insider trading? Respectfully, Judge Lawyer, I believe it's not, I think, then or now. I think the assumption that the corrupt use is being made is not sufficient to satisfy either the conspiracy or the substantive offense. I see that my time has expired, and I have reserved two minutes. Can I just ask a question? Of course. I mean, the court below suggested that Newman was the catalyst for all of this. Yes. But something was a catalyst for Newman to make this argument back, you know, years earlier. And folks were making these arguments. This argument was made in Whitman. It was made in Rajaratnam. And it was made going back into the 80s, even. This was percolating, I guess, is the language that's been used. But wasn't this an avenue to be argued in the last 20 years? I guess, Judge Sullivan, and with apologies, switching it from coffee to tea, everyone recognizes that it was percolating. It continues to percolate. I don't know when the kettle sang. I will say this, though, with respect to the situation that confronted Mr. Dawes and his very able counsel in 2005, threading a real needle here in a context where I think, if you look at the sentencing record, both the government and Judge Deary quite clearly concede that there was less here than met the eye. None of that is directly relevant to all of this. But one of the things that they confronted in weighing the percolation, which began in 1984, 20 years before his plea, and 30 years before Newman, the Fleur case stated quite clearly the proposition that was there for him to argue. I would say that in weighing his risk and gauging the percolation circa 2005, he had to contend with and his lawyers had to contend with the misappropriation line of cases in the circuit, including Falcone and Libera, which did not require a benefit to the tipper. So there's a way of looking at those cases. The Fleur line of percolation was available to this court at that time, and they did not require it as an element of misappropriation. Does a reading agree or disagree with it of Salmon as effectively saying that personal benefit requirement and these issues that we're now dealing with were well established in Dirks? So, okay. Thank you.  Good morning, your honors. May it please the court. My name is Caitlin Farrell. I'm an assistant United States attorney for the Eastern District of New York, and I represent the United States in this appeal. 14 years ago, the appellant Jonathan Dawes pled guilty to a conspiracy to commit insider trading. His guilty plea related to a scheme in which Dawes and others shorted certain companies' stocks after receiving confidential law enforcement information about government investigations of those companies from an FBI agent named Royer. On the basis of this court's 2014 decision in United States v. Newman, which held that a tippee like Dawes must have knowledge of a personal benefit received by the tipper in disclosing the information, Dawes now seeks to overturn his conviction through the extraordinary writ of quorum nobis. The district court denied Dawes's petition on substantive grounds, holding that Dawes allocuted to knowledge of the tipper's personal benefit in both general and specific terms, and that his allocution satisfied the gift theory under the Supreme Court's decision. Your adversary says that when someone allocutes to, I assume, that X, Y, and Z, that's not sufficient as a matter of the insider trading loans. So specifically he allocated to, I was aware in certain instances that Royer had passed such information to Cleveland and Elgindy and assumed that Cleveland and Elgindy were both using the law enforcement information for securities trading and were passing the information to others. Now, the inquiry isn't whether he knew that Cleveland and Elgindy were in fact trading, but rather whether Dawes knew that Royer intended Cleveland and Elgindy to trade on the information. And so his assumption of the former, his assumption that Cleveland and Elgindy were trading on that information, proves his knowledge of the latter, proves his knowledge that Royer intended his recipients to trade. And under Martoma, that's all we need with respect to satisfying the personal benefit. Correct, and it's buttressed by the fact that he himself received a tip from Royer, and Royer told him to short the shit out of the stock. And so not only did the facts show that he was a remote tippy, a second degree tippy receiving information from Cleveland, but also that he directly received a tip from Royer and was told to short the information. And so he knew he had firsthand knowledge that Royer intended his recipients to trade on that information. But intending to trade is the same as getting a benefit, in your view? So Salmon and Martoma talk about two different versions of how you can establish knowledge of a personal benefit. In Salmon, it's the gift of confidential information with expectation that trading will ensue. And then in Martoma, the personal benefit element is satisfied, where you have evidence that the tipper intended to benefit the recipient. And under the facts of this case, both of those are satisfied. We know that Royer intended to benefit his recipient, number one, because he and Cleveland were best friends, which Dawes allocated to. So if he just told a stranger, that wouldn't be enough? Correct, not without additional facts. If he took pity on a person panhandling on the subway and said, here's a tip, would that be enough? Be careful, Ms. Farrell. I am. So just to clarify, Judge Sullivan, your scenario is that a, well, so the person, are we talking about tipper or tippy liability, first of all, is the question in that scenario. If the tippy has no knowledge in your scenario of who the tipper is, where they received that information, whether they're in fact an insider or not, and those would all be relevant to liability under the existing case law. I'm just asking whether that is a benefit to the tipper. He gets that warm, yummy feeling that you get when you bestow something of value on another person who looks in need, whether they're a stockbroker or a panhandler. So it very well may fall under the Salmon rubric, which is a gift of confidential information with the expectation that trading will ensue. And Dawes even points out that you don't have to have a close personal relationship with someone in order to potentially gift them an information, trading information in the, excuse me, Dirk's. In Dirk's, Dirk's himself was receiving confidential information from an insider, but had no personal relationship with that insider. And so I think under Dirk's and Salmon, depending on the other facts of the scenario you're describing, you could have a gifting theory. This is a conversation we could have been having right after Dirk's too. Correct. To the point that wasn't the grounds for the judge below denying the petition, but you're arguing now, which is that they should have known they slept on this for a decade or years. 14 years. And so that's your argument, that nothing really has changed that much with respect to the benefit requirement. That's correct, Your Honor. We are asserting that this court can decide the motion on either procedural or substantive grounds. And even assuming for the purpose of this argument that in 2005, Dawes and his counsel really felt that there was no opportunity to make this argument, despite the fact that Dirk's existed, as this court is well aware, these issues were percolating aggressively in the district courts in at least 2012. As the judge's theory points out. Correct. And so even had this petition been brought at that time as opposed to now, the government would still have the benefit of an additional seven years. Are we talking about the petition or the allocution? The petition, Your Honor. In terms of whether it was percolating. Because if we were talking about the allocution, here is somebody who is getting, in fact, a very lenient sentence because he pleads, and he's not likely to give up on that, on the notion that something that is percolating I might win on. I might try to say I plead, but I reserve. On the other hand, he's not going to be fighting realistically at that point. The petition may be a different issue. Absolutely, Your Honor. There is virtually no doubt that during plea negotiations, the fact that he was only pleading to a 371 charge and ultimately ended up getting no prison time was likely part of his analysis in accepting the plea. But talking not just about the allocution, but about the percolation of these cases in the lower courts, it was possible for him to make this petition seven years earlier than he did because, as this Court is well aware, the district courts were grappling with this very issue, and there was a split among the district courts in the Southern District and in the Eastern District about whether you had to prove knowledge of a personal benefit in order to be criminally liable under the insider trading theory. You say that in any event, there was enough here so that on the law, you're actually saying on the law as it has been all the way through various modifications, there was enough here in terms of what he pled to. That's correct, and that's because Dirks goes back to 1983, and this is a sufficient allocution under Dirks. Even if the allocution were more robust, there are sufficient facts here on the record that he could have allocated to make it an airtight allocution under Martoma and under Salmon. May I ask you just to follow up on the colloquy about the fact that it was charged as a conspiracy to commit insider trading? Does that make a difference? And a second follow-up question is it's a little unusual in my experience to see a conspiracy to commit insider trading charge when someone has arguably committed the substantive offense of insider trading. So I'd like you to talk about both of those things. Certainly, Your Honor. So the relevance of the conspiracy charge, as we discuss in our brief, is that it's clear that Dawes did not know that Cleveland and Royer were sharing profits. And so the point that we make about the conspiracy charge in our brief is that he agreed to commit insider trading with these other two individuals, and the fact that he didn't know about the profit-sharing doesn't matter because he made the agreement to commit insider trading. And so whether the benefit was a personal benefit of gifting information, which is the theory that he allocated under, or a profit-sharing information, because he allocated to conspiracy, it doesn't matter which theory we operate under because both were in existence in this particular conspiracy. And then with respect to your point, I believe he was charged with the substantive crime, but he pled guilty to the conspiracy crime. And so he got a tremendous benefit when pleading guilty because his statutory maximum was five years as opposed to 20 years. He was also charged with a RICO conspiracy, which also carries a much higher statutory maximum than a 371 conspiracy. So it's clear that he had a tremendous benefit by pleading guilty to this crime rather than going to trial on the indictment. And now to challenge that now 14 years later when the underlying facts support the charge of conspiracy to commit insider trading regardless of what he allocated to, those are simply not the facts where the extraordinary writ of quorum nobis is appropriate. One of the elements for a quorum nobis petition is that there be continuing legal consequences. He never got a jail term. He's not on a supervised release. But you've conceded that there are continuing legal consequences. Is that correct? That's correct, Your Honor. He apparently wants to possess firearms and is unable to do so as a convicted federal felon. And so it's apparently— So then everybody who's ever been convicted of a felony can meet the third requirement for a quorum nobis petition. Yes. There's also the issue of him not being able to vote in the state of Tennessee where he lives, which is the second legal hurdle. And so we concede that both of those are legal hurdles here. All right. But it seems to me there's a federal law that bars convicted felons from having a firearm. So there's really only two elements for a quorum nobis petition, it seems to me, is what you're saying for a felon. Well, we don't— In this case, it's obviously a genuine concern because he did, as the record shows, he owned many firearms before being arrested. Perhaps in another case we would— If someone abjures or says, I'm not interested in firearms, then that might be a different issue. Correct. But in this case, he clearly owned many firearms before— Voting by itself would be enough. I mean, certainly if somebody is deprived the right to vote— Yes, and not every state prohibits convicted felons. No, no. So that's not universally true. That's correct, Your Honor. Thank you very much. Thank you. If I could just address very quickly Judge Sullivan's question with respect to the legal impediments. I think it's been waived. I wouldn't spend your time on that. Fair enough. I'd only say that he had used firearms. There's case law to the effect that someone who wishes to work in the securities industry but had never worked in it before comes too late to the quorum nobis table simply to say, I satisfy because I want. He both was a licensed securities broker and he's from Tennessee, so he's a longtime— Was there not a parallel SEC investigation or case? There was a parallel SEC investigation. Mr. Dawes was not charged in it. But by operation of statute, he was nevertheless barred from the securities industry, both as a federal and state matter. To come back briefly to the conspiracy question, I think the answer to that with respect to this allocution is really the same as it would be for the substance of offense. All we can really do is focus now on whether in the aftermath of the Newman statement of knowledge as a requirement, whether Mr. Dawes' statements in that 2005 record actually established that he knew that Mr. Royer was receiving a benefit. I don't believe that he said it at the allocution. I don't believe there is any factual concession by his counsel in the sentencing materials. And in spite of counsel's analysis, which, as I say in our brief, I do think comes too late in the day for this court to entertain with respect to either the notion that there were multiple benefits to Mr. Royer from his Cleveland relationship or on the novel theory that— I want to come back to the question of whether what he did and the facts that we know now— Yes. —could have given rise to a proper allocution at that time for a crime of the sort that he committed. Because, you know, I really wonder whether coram nobis is an appropriate remedy to use to say, at time one, he pleads to something that looks like a crime then. Now, because of a change in law, you're saying, I'm going to say, that is no longer a crime. But there was something else he could have and would have pled because he got such an easy way out back then. But because he didn't do it, we now grant him coram nobis, which is an extraordinary writ. I mean, this isn't just a question of whether, on appeal, he pled to the wrong thing. It's a question of whether we should do something which is an extraordinary remedy because of his change in circumstance. That kind of troubles me. Is that what coram nobis is there for? I would say, Judge Calabresi, that criminal laws should not percolate. Sometimes they do. Insider trading has percolated a fair bit and I think continues to percolate after Newman and after Salmon and will percolate until the Republic crumbles. So my question about conspiracy is really directed at the following, and it's a follow-up to Judge Calabresi's question. You have not really said that he would not have, under any circumstances, allocated to the conspiracy charge had he known about Martoma. If I haven't said it yet, Judge Loyer, I think I have to, and I am saying that he could not allocate to the conspiracy because he did not then and does not now have any knowledge as to a benefit to Mr. Royer from his admitted sharing of information that he should not have shared. And I think it's, final word, I think it's well to remember that the benefit and the only benefit at issue in the larger trial of El Gindi and the analysis that the government has endorsed is that Mr. Royer received half the profits of his trades. So I believe it was necessary and possible for Mr. Dawes to make a Falcone allocution in 2005. Come 2014, that was no longer possible and that's why we're here. And I thank the Court. Thank you very much. Well argued on both sides. Reserved decision.